Argued April 11, affirmed July 17, 1928.

BARTHOLOMEW DIAS *v.* FAVELL-UTLEY REALTY COMPANY ET AL.

(269 Pac. 207.)

For appellant there was a brief and oral argument by *Mr. O. C. Gibbs.*

For respondents there was a brief over the name of *Messrs. Veazie & Veazie,* with an oral argument by *Mr. J. C. Veazie.*

RAND, C. J.—This is a suit by plaintiff to set aside and cancel a deed executed by plaintiff conveying four hundred acres of land to Favell-Utley Realty Company and to quiet title in plaintiff to the conveyed lands. The cause was tried in the court below and,

from a decree dismissing the suit, plaintiff has appealed.

The only allegations contained in the complaint upon which the right to a cancellation of the deed was claimed are those appearing in paragraph III thereof which reads as follows:

"That prior to the fourteenth day of June, 1924, the plaintiff employed and engaged the services of the defendant Favell-Utley Realty Company to procure a purchaser for the land described in paragraph 1 hereof. That during the spring of the year 1924, said defendant informed plaintiff that it had procured a purchaser for the said land and requested plaintiff to execute a deed therefor and place the same in escrow to facilitate the completion of the deal for the sale thereof. That on the fourteenth day of June, 1924, in pursuance of such request of said defendant, plaintiff executed and acknowledged a deed for the said land, with the name of the grantee therein left blank, and deposited the same in escrow with one Chas. Umbach with directions to fill in the name of one Dusenbury as grantee therein and to deliver the same to the said grantee upon the payment to the said Umbach for the plaintiff of the purchase price of $3000.00 for the said land. That the said Umbach, acting in collusion with the said defendant, Favell-Utley Realty Company, and in violation of the instructions and directions given him concerning the said deed as aforesaid, and against the will and wish and without knowledge or consent of the plaintiff, filled in the name of the said defendant Favell-Utley Realty Company as grantee therein and delivered the same to the said defendant; and, on or about the third day of September, 1924, paid over to the plaintiff the sum of $3000.00 as the purchase price for the land therein described."

These allegations were denied by separate answers filed by the defendants and the cause was put in issue by the filing of replies to the new matter contained

in the answers. The cause was then tried and the evidence of both the plaintiff and defendants was introduced and submitted to the trial court for decision. After such submission and before the decision, plaintiff filed a written motion moving the court for leave to amend his complaint by substituting in lieu of the allegations quoted the following:

"That prior to June 14, 1924, plaintiff and said real estate company entered into a contract wherein it was mutually agreed that said company should endeavor to find a purchaser for said land and that in case of sale it should have the usual and customary commission of 5 per cent on the selling price. That in pursuance of said contract said company did in the year 1924 sell said land to the defendant E. T. Dusenbury at the price of $15,200, paying the plaintiff $3000.00 and retaining the balance which the defendants Favell-Utley Realty Company, O. J. Gray and one Charles Umbach secretly agreed to divide among themselves. Reference is hereby made to defendants' exhibit J as a part hereof. That in order to defraud plaintiff and obtain an exorbitant commission for themselves as aforesaid, said Gray, Favell-Utley Realty Company, and one Charles Umbach, conspired and worked together to conceal from plaintiff the real consideration and to have the title to said land transferred first to said company, then to said Gray, and finally to said Dusenbury, and committed the following acts and concealments: By false representations as to being crowded for time, plaintiff was induced to sign a deed in which the name of the grantee and the real consideration were purposely left blank. That the name of the Favell-Utley Realty Company was afterwards filled in as grantee in said deed without knowledge or consent of plaintiff and contrary to his instructions, and the true consideration never has been filled in. That the said deed was filed to record and recorded in the office of the County Clerk of Lake County, on the 2nd day

of September, 1924, in Volume 65, at page 389, Records of Deeds of said County, to which reference is hereby made as a part hereof. That plaintiff was deceived by the false representations and concealments as aforesaid, believed and acted on the same, and did not learn that the name of said company appeared in said deed as grantee until September, 1924, nor did he learn the real consideration in the sale to said Dusenbury until after the suit had been begun.''

This motion was denied and plaintiff now assigns as error the denial of said motion and the refusal of the trial court to enter a decree awarding judgment to plaintiff for the sum of $12,200.

An examination of that part of the complaint to which we have referred shows that plaintiff bases his right to a cancellation of the deed upon an alleged relation of principal and agent existing between himself and Favell-Utley Realty Company, arising from its contract with him to find a purchaser for the land, and also upon the alleged fact that he executed a deed, leaving the name of the grantee blank, and deposited it with a third party who was authorized to insert the name of and deliver it, upon the payment of the purchase price, to a particular grantee and who had no authority to insert the name of or deliver the deed to Favell-Utley Realty Company, as was done in this case.

■■ It is a rule, and we think it has no exception, that an agent authorized to sell his principal's property may not, without the latter's consent, become the purchaser of it and that if he does so the principal may repudiate the act and recover back his property or if the agent has disposed of it at a profit the principal, if not guilty of laches, may compel an ac-

counting for the profits. In such a case, says the author of 1 Mechem on Agency (2 ed.), Section 1198:

"The law looks at the natural and legitimate tendency of such transactions, and not at the motive of the agent in any given case. This tendency is demoralizing, and the fact that in a certain case the agent's motive was honorable, or that the result is more beneficial to the principal, will make no difference if the latter chooses to repudiate it."

■ And where an agent employed to sell land purchases, with the consent of the principal, the land himself and conceals from his principal the fact that he intends to sell the land to another for a greater price, he is guilty of such fraud as will invalidate the sale to him: *Rodman* v. *Manning*, 53 Or. 336 (99 Pac. 657, 20 L. R. A. (N. S.) 1158). Hence, it follows that if the facts are as alleged in the complaint and the relation of principal and agent existed between Favell-Utley Realty Company and plaintiff at the time of the transaction complained of, plaintiff may repudiate the deed and recover back the land unless the land has passed to an innocent purchaser for value and without notice.

■ The burden of proving that Favell-Utley Realty Company was the agent of plaintiff at the time it purchased the land rested with plaintiff since he alleged that to be a fact and it was denied by the answer. After a careful examination of the record, we find no evidence sufficient to establish the agency, even if we considered the testimony of plaintiff alone. It appears from his testimony that since 1919 he has been endeavoring to sell this tract of land and has had numerous talks with Mr. Utley of Favell-Utley Realty Company, requesting him to find a purchaser for the land and that, according to his own testimony,

he always refused to give him written authority to act as such agent. He consulted at the same time and in the same way every real estate agent in Lakeview and refused to give any of them any authority to sell his land. He was anxious to sell the land for $2,800 and was unwilling to agree to pay any commission or to employ anyone to find a purchaser for him. His business during all of the time was conducted by Mr. Charles Umbach, whom he now charges as being a party to a conspiracy to defraud him. In December, 1923, the defendant company wrote him a letter in which it was stated that it thought it could dispose of the land for him. He did not accept its offer and he refused to sign the writings which it inclosed. Taking his own testimony alone, it is insufficient to establish the relation of principal and agent between them. The other testimony absolutely contradicts his claim. Therefore, we hold that the question of agency is eliminated from the case under his and all the other testimony in the case.

■ The facts established by the evidence are as follows: Plaintiff was formerly a sheep owner and acquired the land in controversy while engaged in that business. Upon going out of the sheep business, he commenced to hunt for a purchaser, offering the land for $2,800, but he never obtained a buyer. The land was chiefly valuable for grazing purposes. It had a small amount of growing timber, the amount shown by the cruise being 1,400,000 feet. It was surrounded by heavily timbered lands, in connection with which the small amount of timber thereon could be logged. Taken alone, it was of no value for anything more than a very small timber operation. Around and in the immediate vicinity of this land was a large tract containing 14,414 acres, known as the Irvine

tract, which cruised some seventeen or eighteen thousand feet per acre. The defendant, O. J. Gray, was the agent of the owners of the Irvine tract and had authority to dispose of this tract at $40 an acre less 5 per cent commission. Knowing that plaintiff was desirous of selling his land for the sum of $2,800, Mr. Gray wrote to Mr. Utley of Favell-Utley Realty Company on March 28, 1924, asking him to secure an option upon plaintiff's land and requested him to take a deed in his name and then convey it to Gray, so that Gray could include it with the Irvine tract and with some other tracts of timber land in a sale to the defendant E. T. Dusenbury, a large timber operator, who was seeking to acquire the Irvine tract. Because of its proximity to these other tracts of land which were so much more heavily timbered, Gray conceived the plan of selling all of the tracts on an acreage basis and he had the consent of the Irvine owners to do so, so long as they got the full purchase price of their lands. Mr. Dusenbury was willing to buy the entire combined tract of land in order to obtain the Irvine lands and entered into a contract with Gray to purchase all of the land on an acreage basis of $38 per acre. This contract, although extending over a period of years, has been, in all respects, complied with by Dusenbury so far as the evidence shows. Plaintiff came to Lakeview some time in April, 1924, and went to see Umbach, who knew nothing about the Gray-Dusenbury dealings but who did know that the defendant company wanted to purchase this particular tract of land belonging to plaintiff. Plaintiff was working as a camp tender some distance from Lakeview and Umbach told him that, in order to make the sale, he would prepare the deeds, leaving the name of the grantee blank, and

have them witnessed and signed and left with him for delivery when the money was paid. This was done. Some time in June the defendant company gave a check to Umbach for $200 and later, in September, another check for $2,800, the balance of the purchase price. Umbach paid all of this money over to plaintiff and plaintiff was well satisfied with the deal until later, when he learned that Dusenbury was paying for all of the land, including that which plaintiff had sold, at the rate of $38 per acre. Before the deed had been delivered to the defendant company, plaintiff raised the price from $2,800 to $3,000, which was the amount paid. The land itself was conveyed by Favell-Utley Realty Company to Gray and by Gray to Dusenbury, the deed to Dusenbury being placed in escrow in the Bank of California in Portland, Oregon, where it is now being held in escrow pending Dusenbury's performance of his contract with Gray.

Mr. Gray was a witness. He testified that he had had many services performed for him by Utley and that in consideration of the services he intended, when the contract was fully performed by Dusenbury, to allow Utley one half of the profits of the sale of the tract of land formerly belonging to plaintiff. According to plaintiff's own testimony, the purchase price which he established himself was $3,000, which he was to receive net, and that he has never paid any commission nor offered to pay any commission nor contracted to pay any commission. Under his testimony, if the defendant company had been employed to find a purchaser for the land at a net price to him of $3,000, it would have had a right to make any profit which it could over and above that

amount, provided there was no concealment or fraud upon its part.

The charge made against Mr. Umbach that he conspired with the defendant company is wholly unsustained by any evidence in the case. Mr. Umbach knew nothing of the transaction between the defendant company and Gray, nor the transaction between Gray and Dusenbury. He acted in entire good faith and received no compensation whatever for his services.

The contention that plaintiff gave specific directions to Umbach to fill in the blank in the deed by writing in the name of Dusenbury is not supported or sustained by his own testimony. He said he went to Lakeview on April 14, 1924, met Utley on the street and had a conversation with him about the sale of the land. He testified that Utley said to him:

"I believe the deal will go through all right, it will probably be June before you get the money, but you will have it to spend the 4th if you feel that way."

He then went to see Umbach and had this conversation with him:

"He said, 'Have you seen Harry Utley this morning?' and I said, 'Yes, just came from talking to him, met him up the street.' He said, 'Did he say anything to you for to have the deeds wrote for the land?' He talked like he had already talked with Mr. Utley about the matter, because he brought the subject up in those words, and I said, 'No, Mr. Utley didn't say anything about deeds.' 'Well' he says, 'this man here to buy this land, he is a millionaire Wall Street man, and he comes in here in a hurry—the longest he can stay in town is over night—sometimes he don't even do that' and 'you are out in the sheep camp away from anybody and it would take quite a while to go hunt you up, so the best way we have been thinking is you should leave the deeds here in town all filled out and when he comes in to

transact the thing we don't have to go and hunt you up' * * 'You better come up this evening or before you go out and I will have these deeds ready for you to sign and I will have it here and any time Favell and Utley calls for them I will turn it to them and they can go and transact the deal and I will get the money from them and they will turn it over to me and I will hold it here or deposit it in the bank as you like, for you when you come in.' I says, 'Who is the man buying the land?' He said, 'His name is Dusenbury.' I said, 'All right, Mr. Umbach, I will, I am going down and when I get ready to go out I will come to your office and sign the deed and have them ready.' ''

He further testified that he went to Umbach's office that evening, signed the deed with the name of the grantee left blank, and delivered it to Umbach for delivery upon payment to Umbach for him of the sum of $3,000. His testimony shows clearly that there was no specific direction given by him either to insert the name of Dusenbury in the deed or any other name. He left that matter entirely to Umbach and he was not concerned in any way with whom the grantee might be. His sole concern at that time was to get the purchase price of the land. He has received everything he bargained for and is not entitled to any equitable relief. This renders it unnecessary to consider the question of whether the court erred or not in refusing to grant the amendment for, if granted, the amendment could have been of no avail to plaintiff.

For the reasons stated, the decree of the lower court will be affirmed. AFFIRMED.

COSHOW, McBRIDE and ROSSMAN, JJ., concur.